```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF KENTUCKY
```
**CENTRAL DIVISION** at **LEXINGTON**

|  |  |
|---|---|
|  | ) |
|  | )  MDL. No. 1877 |
|  | ) |
| IN RE CLASSICSTAR MARE LEASE | ) |
| LITIGATION | )  Master File: |
|  | )  Civil Action No. |
|  | )  5:07-cv-353-JMH |
|  | ) |
| and | ) |
|  | ) |
| PREMIERE THOROUGHBREDS, LLC, | ) |
| *et al.*, | ) |
|  | )  Civil Action No. |
|  | )  5:07-cv-348-JMH |
| Plaintiffs, | ) |
|  | ) |
| V. | ) |
|  | ) |
| CLASSICSTAR, LLC, *et al.*, | ) |
|  | ) |
| Defendants. | ) |

**MEMORANDUM OPINION & ORDER**

**\*\*\* \*\*\* \*\*\***

This matter is before the Court upon Defendant John Parrott's Joint Motion to Dismiss Fourth Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) & 9(b) [DE 200, 216, 219].[1] For the reasons that follow, his Motion will be denied.

---

[1] All other parties to this motion have reached a settlement with Plaintiffs or have been otherwise dismissed from the case at this time.

## I. Factual Averments

Plaintiffs allege that ClassicStar, LLC, and a number of subsidiaries and related entities operated a thoroughbred breeding business on farms belonging to ClassicStar's wholly owned subsidiary, ClassicStar Farms, LLC. [Complaint ¶¶ 43-44.] In 2001, ClassicStar was acquired by GeoStar Corporation, a limited liability company owned by Ferguson, Robinson, and Parrott. [Complaint ¶ 42.] From that point forward, Ferguson actively managed both ClassicStar and GeoStar in relation to those portions of their business of which Plaintiffs complain while Robinson and Parrott negotiated with salespeople and professionals and took other actions which facilitated offering for participation Mare Lease Programs. [Complaint ¶¶ 59-60.]

Prior to its acquisition of ClassicStar, GeoStar had operated as an energy development company with interests in various mineral reserves, primarily coal bed methane beds, located throughout North America. GeoStar had raised funds for its development of these properties primarily through the sale of working interests in various wells to be drilled on the properties. It undertook this development through various subsidiaries, including a public traded company, Gastar Exploration, Ltd. ("Gastar"), which was wholly controlled by GeoStar and its members Ferguson, Robinson, and Parrott. [Complaint ¶¶ 53-56.] After its acquisition of ClassicStar, GeoStar designed the Mare Lease Programs as an

alternative means of raising funds for its mineral development. [Complaint ¶ 46.] Throughout this period, it continued to maintain and exercise control over a substantial portion of ClassicStar and its finances. [Complaint ¶ 44-45.] Plaintiffs aver that the Mare Lease Programs themselves were operated by ClassicStar and by numerous of its subsidiaries including CFI and ClassicStar Thoroughbreds without regard to the separate existence of those companies. [Complaint ¶ 44.]

As the Programs matured, GeoStar and Ferguson, Robinson, and Parrott formed various other entities to facilitate the sales and enlisted other entities to further the scheme. NELC, a company financed by ClassicStar and operated by ClassicStar's accountant, existed to provide financing to parties transacting with ClassicStar. [Complaint ¶¶ 89, 91.] Additionally, entities such as GFS and FEEP were used to disguise the shortfall of breeding pairs available for the Programs. [Complaint ¶¶ 36, 48, 61-68.] Ferguson, Robinson, and Parrott served as either officers or directors of GEEI, FEEP's managing member, and as members of its advisory committee. [Complaint ¶ 12, 25, 48, 67.]

Beginning in 2001, ClassicStar generated hundreds of millions of dollars from the ClassicStar Mare Lease Programs. [Complaint ¶¶ 1, 83.] ClassicStar marketed its Programs to individuals and companies having an interest in the thoroughbred horse industry. [Complaint ¶ 2.] The Programs allowed participants to lease a mare

3

belonging to ClassicStar, for the duration of one breeding season, at a cost set at 30% of the fair market value of the mare. [Complaint ¶¶ 79-82.] In addition, the Programs provided for breeding of the mare with a selected stallion and board for the mare and the resulting foal. [Complaint ¶¶ 77-78.]

Much of ClassicStar's marketing featured the Kentucky properties owned by its subsidiary, ClassicStar Farms, and promoted ClassicStar's success in the thoroughbred industry. In addition, ClassicStar encouraged participants to participate in the Program despite the high price by arranging for the financing of at least half of the cost through a lender selected by ClassicStar. [Complaint ¶ 89.] The participants were offered further inducement in the form of several subsequent business opportunities, each involving GeoStar or its affiliates, which would eventually allow participants to retire this note and convert a number of their equine interests into a less labor-intensive business opportunity. [Complaint ¶¶ 81, 128, 134.] Finally, ClassicStar represented that it had structured the Programs so as to allow participants to claim a tax deduction in the full price of the Package, including the loan. [Complaint ¶ 79.] ClassicStar reaped the benefits of the tax savings thus generated, when participants transferred the refunded funds to ClassicStar/NELC and or to participate in the Program, and ClassicStar passed these benefits along to its controlling parent GeoStar, which utilized

4

the Programs to raise tens of millions of dollars to fund its own operations. [Complaint ¶¶ 93, 156.]

From 2001 through at least 2005, ClassicStar promoted the Programs itself and through a number of related entities which Plaintiffs claim had no function or existence separate from ClassicStar, including ClassicStar 2004, which took over the Mare Lease Program Sales from 2004 forward, and CFI, which contracted with personnel to promote and offer to participants the Programs. [Complaint ¶ 44.] These personnel, such as Doug Anderson, David Plummer and Spencer Plummer and ClassicStar's marketing materials represented to the Plaintiffs and others that monies transferred to participate in the Mare Lease Programs bore a relationship (in the amount of 30%) to the value of the underlying mares owned by ClassicStar and that the full cost of the Program could be tax deducted by qualified individuals participating in a breeding business. [Complaint ¶¶ 79-80.]

In fact, the breeding pairings for which participants paid tens of millions of dollars consisted primarily of quarter horses owned by David Plummer, not ClassicStar, and assigned such grossly inflated values. [Complaint ¶ 87.] ClassicStar resorted to this tactic because it consistently offered far more Programs to participants than supported by thoroughbred interests owned by ClassicStar. [Complaint ¶ ¶ 88-90.] GeoStar, and Ferguson, Robinson, and Parrott specifically approved this substitution of

5

overvalued quarterhorses for the thoroughbreds that the contracts and marketing materials represented that participants would own.

Plaintiffs aver that, had a truly disinterested lender financed the transaction, its investigation would almost certainly have uncovered this deception prior to Plaintiffs' payment. Therefore, to conceal the fraud, ClassicStar placed the loans with NELC, a company formed by persons affiliated with ClassicStar and one which would not insist on independent confirmation of the horses' value. [Complaint ¶¶ 89, 92.] Because NELC lacked the resources to actually finance such a large volume of transactions, ClassicStar transferred the amounts needed to fund the loans to NELC, and NELC transferred them back to ClassicStar as loan proceeds. [Complaint ¶ 91.]

Unfortunately, the connection between NELC and ClassicStar called into question the deductibility of the loan, a major marketing point of the Programs, because the applicable regulations do not allow for the deduction of debt owed to interested parties. [Complaint ¶ 92.] Knowing that Plaintiffs and other contributors relied on NELC's status as a third party lender, both NELC and ClassicStar did not disclose this fact and actively cooperated in structuring the loan portion of the transaction in such a way as to conceal the fraud. [Complaint ¶¶ 89-91.]

In the same manner, had participants actually needed to liquidate a portion of their Programs to repay NELC, they would

6

have quickly discovered the inflated values. To forestall this eventuality, GeoStar, the ultimate beneficiary of the proceeds, proposed a number of secondary transactions which would allow the largely fictional portions of the Programs to be exchanged for some asset provided by or associated with GeoStar. [Complaint ¶¶ 81, 83, 84.] These included stock in Gastar, a publicly traded Canadian company controlled by GeoStar, working interests in coal bed methane fields operated by GeoStar, and units in companies managed by GeoStar affiliates, including GEEI which purported to manage a limited liability company called First Equine Energy Partnership ("FEEP") whose units Plaintiffs obtained in exchange for their quarter horse interests. [Id.] NELC would accept some portion of these interests in repayment of the loan, thus perpetuating the fraud. [Complaint ¶¶ 129, 134.]

FEEP, which was managed by GEEI, served one such secondary transaction. FEEP involved the exchange of participants' largely fictional equine interests for FEEP units. [Complaint ¶¶ 61-67.] FEEP's assets purportedly consisted of the contributed breeding rights as well as working interests in a number of coal bed methane wells contributed by the manager and owner of the common units, GEEI. [Complaint ¶ 63.] According to the FEEP prospectus, these working interests would generate cash sufficient to service the debt associated with the Mare Lease Programs, and the FEEP units would collateralize the NELC debt. [Complaint ¶ 64.]

7

To further entice participants into this transaction, which disguised the overselling of the Mare Lease Program, FEEP units carried with them a put option guaranteed by GeoStar, and GeoStar's principals Ferguson and Robinson vouched for the transaction by serving on FEEP's Advisory Committee. [Complaint ¶¶ 65, 67.] However, because GeoStar and Gastar had already engaged in transactions involving the supposedly contributed working interests, FEEP could not have performed as represented, a fact which Robinson and Ferguson, as principals of GeoStar and Gastar and members of FEEP's Advisory Committee, must have known. [Complaint ¶ 66, 67.]

GeoStar, which had owned 100% of ClassicStar since July 2001, controlled ClassicStar and took an active role in this scheme. [Complaint ¶¶ 42, 45, 134.] Marketing materials used by Ferguson to offer to participants the Programs identify ClassicStar as "a division of the `GeoStar Group' and identify the alternative business opportunities which will allow participants to cash out a portion of their interests and repay the loan. [Complaint ¶¶ 117, 134.] In fact, a number of such exchanges did take place, again concealing the fraudulent nature of a huge portion of the Programs. *[See, e.g.,* Complaint ¶¶ 128-136] Moreover, under the guise of these transactions, ClassicStar funneled over $100 million to GeoStar, including $40 million in 2004. [Complaint ¶

8

85.] GeoStar took these funds knowing that its subsidiary's equine assets could not support legitimate sales of this magnitude and while actively cooperating with ClassicStar to conceal that fact. [Complaint ¶ 85.]

Robinson, Parrott, and Ferguson not only owned the vast majority of GeoStar, but they also clearly directed its operations. By way of example, Ferguson caused GeoStar to perform its part in the overall scheme. *[See, e.g.,* Complaint ¶ 45-48, 67, 71.] Ferguson, one of three owners of GeoStar, directed its participation in the alternative business opportunities, and, Plaintiffs believe, prepared or approved that portion of the marketing materials used to induce Plaintiffs to participate in the Programs. [Complaint ¶ 72.] Moreover, Ferguson actively marketed the alternative business opportunities offered as part of the overall pitch. [Complaint ¶¶ 72, 109.] At various times in connection with the Mare Lease Programs, Ferguson identified himself as President and CEO of GeoStar and Gastar. [Complaint ¶ 72.] He also served as a member of FEEP's advisory committee, according to its private placement memorandum, and as the contact person and tax partner for FEEP. [Id.] Finally, Ferguson, through his ownership of GeoStar, is entitled to share in its profits. [Complaint ¶ 12, 14.] Similarly, Ferguson has, throughout the relevant time period, controlled and directed ClassicStar's activities, including inducing Plaintiffs' participation in the

Mare Lease Programs. [Complaint ¶ 111, 117.] Materials provided to Plaintiffs and other participants described Ferguson as ClassicStar's co-managing member, and he acted as such. [Complaint ¶ 72.]

Parrott and Robinson, in addition to their ownership interest in GeoStar, also took active roles in the management of ClassicStar's sale and promotion of the Mare Lease Programs. [Complaint ¶ 71.] Both negotiated with various salespeople to pay the salespeople commissions in return for promoting the ClassicStar Mare Lease Programs. [Complaint ¶ 71.] Parrott, for example, negotiated an arrangement to pay a commission to a law firm representing another set of plaintiff Program participants involved in this multidistrict litigation for promoting the Programs. *[Id]* Similarly, Robinson, while purporting to act on behalf of ClassicStar Farms, signed an employment agreement with David Plummer which set forth Plummer's obligations with regard to the promotion of the Mare Lease Programs. *[Id.]* Parrott also reviewed and approved marketing materials used by ClassicStar and provided to Plaintiffs, including materials illustrating projected returns which had no basis in fact and attorney opinion letters offered to participants to reassure them regarding the tax aspects of the Programs. [Complaint ¶ 76.] Parrott approved these letters despite his knowledge that material facts, such as the relationship

10

between NELC and ClassicStar, had not been disclosed to the recipients. [Complaint ¶ 94.]

Plaintiffs invested more than $3 million in Programs with ClassicStar to begin a horse breeding business. [Complaint, ¶¶ 8-9, 180.] Plaintiffs' aver that their contributions to ClassicStar to begin their horse breeding business were made in reliance on: (1) ClassicStar's marketing materials touting its quality equine offerings and tax benefits, prepared under the supervision of Ferguson, ClassicStar's managing member; (2) schedules reflecting the alleged value of the Programs, prepared by Plummer on GeoStar and ClassicStar's behalf; (3) tax opinions procured by ClassicStar regarding the deductibility of Program-related expenses; and (4) the presentations of ClassicStar salespeople such as Doug Anderson and David Plummer, which described both the Mare Leases and the potential alternative business opportunities related to GeoStar. The aver that at no point did anyone affiliated with ClassicStar disclose the fact that Plaintiffs' payments and tax deductions rested on extremely overvalued quarter horse leases, that the lease fees bore no relation, much less a correspondence of 30%, to the actual value of the horses, that Plummer or SOS actually owned the horses ClassicStar purported to own, or that NELC was financed by ClassicStar, or that the alternative investments unquestionably such as FEEP, managed by GEEI, could not have performed as represented. They contend that Parrott, along with others,

11

authorized the misstatements and omissions upon which they relied in making their investment and that he also took the benefit of the wrongfully obtained funds while knowing that ClassicStar had obtained those funds through fraud.

Defendant ClassicStar, LLC, raised over $500 million dollars from over 150 separate Mare Lease Program participants between 2001 and 2004. [Fourth Amended Complaint ("Complaint") ¶¶ 1, 83.] ClassicStar raised these funds by offering participation in Mare Lease Programs to potential participants through a series of representations concerning guaranteed profit opportunities and guaranteed tax. To date, Plaintiffs received nothing of value in return except for $160,000 as partial payment on a Bill of Sale.

## II.   Standard of Review and Applicable Law

In evaluating a Rule 12(b)(6) motion, the factual allegations of the Complaint "must be enough" that the right to relief is "above the speculative level" and is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the complaint pleads facts "merely consistent with" liability, it "stops short of the line between possibility and plausibility of entitlement to relief." *Id*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

"When analyzing questions of federal law, the transferee court should apply the law of the circuit in which it is located." *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996). "When considering questions of state law, however, the transferee court must apply the state law that would have applied to the individual cases had they not been transferred for consolidation." *Id*. In this instance, that is the law of the State of Florida.

### III. Discussion

Defendant Parrott argues that Plaintiffs' civil RICO claim pursuant to 18 U.S.C. § 1962(a) fails because they have not pleaded an injury associated with the receipt of money from a pattern of racketeering activity and the investment of that money in an enterprise that affects interstate commerce. The Court rejects this argument because Plaintiff's the details of which are accepted as true for these purposes, clearly establish that: (1) the RICO defendants used money derived from alleged racketeering activity, stating a claim under 18 U.S.C. § 1962(a); (2) the RICO defendants conducted the affairs of the Enterprise by soliciting investments through committing, *inter alia*, mail fraud, a predicate act for the purposes of establishing racketeering activity for the purposes of both 18 U.S.C. §§ 1962(a) and (c). *See H.G. Gallimore, Inc. v. Abdula*, 652 F.Supp. 437, 450 (E.D.Ill. 1987). The Court concludes that Plaintiffs properly state RICO claims against

Parrott under 18 U.S.C. § 1962(a) in their complaint and that his motion to dismiss must be denied in this regard.

In determining whether a plaintiff suffered harm by reason of the investment or use of the proceeds of racketeering in an enterprise in violation of 18 U.S.C. § 1962(a), Courts have broadly construed the terms "investment" or "use," generally as only requiring proof that illegally derived funds flowed into the enterprise," *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 441 (5th Cir. 2000) (citation omitted), and not requiring any proof of direct or immediate use of the racketeering derived income. *United States v. McNary*, 620 F.2d 621, 628 (7th Cir. 1980). Here, Plaintiffs aver that they suffered injury beginning in 2003 that stemmed from the defendants investment of money obtained from prior racketeering activity (beginning in 2001 and extending through 2005) against previous purchasers of the deliberately overvalued Mare Lease Programs.

Courts have held that an 18 U.S.C. § 1962(a) "investment injury" exists if the investment scheme or enterprise was funded with monies from the defendants' racketeering activity against prior victims. *See Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385, 396 (6th Cir. 1989) ("(I)f the defendants used income derived from racketeering activity in 1980 and 1981 to establish and operate the alleged scam in which the plaintiffs put their money in 1982 and 1983, we do not see why it would be impossible for the

14

plaintiffs to show that they had been injured by a violation of § 1962(a)."); *Williamson*, 224 F.3d at 444 (finding that plaintiffs sufficiently alleged injury from investment of prior racketeering proceeds into the enterprise); *Cook v. Easy Money of Kentucky, Inc.*, 196 F. Supp. 2d 508, 514 (W.D. Ky. 2001) (plaintiffs sufficiently pled § 1962(a) injury where the defendants received income from prior unlawful debt collections and used the income to operate and expand the enterprise). The Complaint alleges that from the outset ClassicStar oversold the Mare Lease Programs by drastically inflating the value of the thoroughbred breeding interests, selling Programs with a total cost of tens of millions of dollars greater than the actual thoroughbred interests owned by the defendants could support. The income from these sales supported the Enterprise's operations, allowing for the creation of a legitimate façade that induced Plaintiffs to purchase the overvalued Programs.

Moreover, the Moving Defendants' investment or use of the racketeering proceeds from earlier fraud to pay the next set of investor-victims also made it much more difficult for Plaintiffs to discover the fraudulent scheme. *See Kmart Corporation v. Areeva, Inc.*, Civil Case No. 04-40342, 2006 WL 2828572, *5 (E.D. Mich. Sept. 29, 2006) (finding that plaintiff pled sufficient § 1962(a) injury where it alleged defendant used income generated from initial racketeering enterprise to establish off-shore

15

corporation, making it more difficult for plaintiff to uncover defendant's fraud). By funneling the Enterprise money to GeoStar and to NELC, particularly by way of the circular loan structure and FEEP interest exchanges, the defendants worked to conceal their fraudulent activities by obscuring the actual value of the equine interests and the Mare Lease Programs, thus, making it more difficult for Plaintiffs to initially uncover the scheme and to ultimately recover their money. Effectively, Plaintiffs allege that Defendant Parrott played a role in a scheme which operated a closed loop in the hopes of forestalling Plaintiffs' knowledge of the shortfalls that were inevitable due to the lack of underlying breeding opportunities at the foundation.

Further, the elements of a claim under Florida's RICO statute are: (1) conduct or participation in an enterprise; and (2) a pattern of racketeering activity. *Nicor Intern. Corp. v. El Paso Corp*., 318 F. Supp. 2d (S.D. Fla. 2004). Florida's racketeering statutes have been consistently interpreted using federal RICO claims cases. *All Care Nursing Svcs., Inc. v. High Tech Staffing Svcs., Inc.*, 135 F.3d 740 (11th Cir. 1998), *cert. denied* 526 U.S. 1016 (1999); *see also Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1264 (11th Cir. 2004) (internal quotes and citations omitted). Thus, the analysis applied to Plaintiffs' federal RICO claims is equally applicable to their state RICO claims. *See id*.

To the extent that each of the defendants derived income from

16

the fraudulent sales, as alleged, each bears responsibility for the investments that led to Plaintiffs' participation and forestalled their discovery of the fraud. Parrott's Motion to Dismiss will be denied in this regard.

Accordingly, **IT IS ORDERED** that Defendant Parrott's Motion to Dismiss [DE 200] is **DENIED**.

This the 19th day of January, 2019.

Signed By:
*Joseph M. Hood*
Senior U.S. District Judge